*519 OPINION OF THE COURT
W. Dennis Duggan, J.
The issue in this case is whether alleging that the respondent called a person a “faggott [sic]” and struck him in the nose sufficiently pleads the hate crime of aggravated harassment in the second degree. (Penal Law § 240.30 [3].)[1] The court finds that it does not.
This case involves a claim that one 14-year-old male confronted another 14-year-old male on the street and called him a faggot and punched him in the nose.
Contrary to the respondent’s initial assertions, the court finds that the addition of the extra letter “t” at the end of “faggott,” which makes it a nontraditional spelling of the term, is of no consequence to the determination of this motion. Also, the misspelling does not cause any confusion with the other word “fagot” (more often spelled with two “g”s) which has the same pronunciation but which usually refers to a bundle of twigs. The origin of this meaning most likely comes from the Greek “phakelos” for bundle through the French word “fagot.” The word faggot’s most common meaning, a bundle of twigs used for kindling, was widely used in English literature. For example:
“Autumn’s red-lipp’d fruitage too,
“Blushing through the mist and dew,
“Cloys with tasting: What do then?
“Sit thee by the ingle, when
“The sear faggot blazes bright,
“Spirit of a winter’s night” (John Keats, Fancy [emphasis added]).
However, the word faggot has been called into use in many other ways. In addition to a bundle of twigs used for fuel, it can *520 also mean the following: (1) a bundle or bunch of anything; (2) a bundle of iron rods bound together; (3) orange peels pared very thin; (4) a ball of seasoned chopped liver which has been baked or fried; (5) a person temporarily hired to provide a sufficient number of soldiers to pass at the regimental muster; (6) a heretic who has been burned at the stake; (7) a billet for stowing casks, and, ironically, (8) a term of abuse or contempt applied to a woman.[2] (Oxford Dictionary of English Language [22d ed 1982].) The Oxford Dictionary makes no reference to faggot meaning a male homosexual, which is not surprising given that it is not a common slang usage in the United Kingdom.
The origin of the term faggot to derogatorily refer to a homosexual male is obscure and subject to much urban legend. It appears to be a predominantly American usage. In Britain, for example, as noted above, a faggot would refer not only to a bunch of twigs, but also to a ball of seasoned chopped liver which has been baked or fried. A fag would usually mean a cigarette. However, it is clear that, in the United States, a person of ordinary intelligence (including a teenager) would take it as a derogatory term for a male homosexual and no reasonable person would infer that the respondent was calling the alleged victim a bunch of twigs. (See American Heritage Dictionary of English Language 655 [3d ed 1992].) This is the starting point for our legal analysis.
For a juvenile delinquency petition to be sufficient, three requirements must be met but only one of those is at issue in this case. The petition and supporting depositions must contain nonhearsay statements which, if true, support every element of the crime charged. In this case, the documents must contain nonhearsay statements of fact which, if true, would establish that the respondent was motivated to strike the complainant because of a belief or perception about the complainant’s sexual orientation. The statute makes clear that this belief or perception does not have to be correct.
Supplementing the statement in the petition, the complainant’s sworn deposition states as follows:
*521 “I know John V. from previously attending Watervliet Elementary School with him. John V has had issues with me starting in October & November, 2005. In the past, he has made references and stated that I was a queer, faggot, and a fucking bitch . . . Upon crossing 4th Avenue, I observed John run from the group towards me. John approached me. I turned around and stated to John, ‘What do you want.’ John stated, ‘this is what you get for calling the cops on me Faggot.’ At this time John used his hand and struck me in the nose.”
Accordingly, based on this record, the court must find that the mere allegation that an alleged victim was called a faggot is enough to establish that the respondent was motivated, at least substantially, to act because of his belief that the alleged victim was a homosexual. On the other hand, if the presentment agency is arguing that calling the alleged victim a faggot is a sufficient allegation, they would also have to maintain that also calling him a “fucking bitch” at the same time is evidence of the respondent’s confusion about the alleged victim’s gender. The court finds that the “faggot” allegation, standing alone as it does, is not enough and the petition must be dismissed.
First, the petition and supporting documents allege no facts to support a direct finding or an inference that the alleged victim is a homosexual. Second, there are no alleged facts to support a direct finding or an inference that the respondent believed that the alleged victim was a homosexual — except for the fact that he called him one. Finally, there are no statements of fact to support a direct finding or an inference that the respondent’s actions were motivated by a belief held by the respondent that the alleged victim was a homosexual. The most natural inference that can be drawn from the respondent’s complete statement is that he was motivated by revenge because the alleged victim called the cops on him.
To sustain this petition, the court would have to conclude that any 14-year-old boy who called another 14-year-old boy a faggot was motivated to hit him because he believed the person was, in fact, a homosexual and that conclusion would have to be based entirely on the fact that he called him a faggot. Anyone with any knowledge of teenage boys would conclude that it is just as likely, or even more so, that this is typical teenage trash-talking. Except for the Rivera decision {infra), the cases cited by the presentment agency support this conclusion.
*522 In People v Rivera (144 Misc 2d 565, 566 [1989]), the court sustained an information that alleged that the defendants yelled “Nigger Bitches, we should take your earrings” and then chased them into a building. The defendants objected to the information because it alleged nothing about the race of the alleged victims. For example, if the alleged victims were white, even though the defendants called them “Nigger Bitches,” it is hard to see how this event could have been charged as a hate crime. Within the four corners of the Rivera pleading, the race of the alleged victims could be anything. If the alleged victims turned out to be white, the prosecution would then have to rely on the absence of mistake provision; namely, that although the defendants called the women “Nigger Bitches” and although they were mistaken, it was still a hate crime because they believed them to be black. That alternative is preposterous and shows why more facts must be alleged in the petition. Moreover, it also shows why the defendants were entitled to a due process notice of that element of the crime that requires proof on the issue of the defendants’ belief or perception as it relates to some protected class.
The Rivera court held that: “Although that would have been the better course [to allege the race of the alleged victim], ‘the element of intent may be made out by the conduct and circumstances.’ ” (Rivera at 569, quoting People v Gore, 143 Misc 2d 106 [1989].) However, it is not the law of criminal pleadings that an element of the crime may be supplied to the charging instrument with evidence later produced at trial. The respondent had a due process right to have factual support for each element of the crime set forth in the petition.
The purpose of a criminal pleading is to give notice to the respondent of the elements of the criminal act against which he must defend. The reason why an accusatory instrument must contain nonhearsay statements of fact which, if true, establish every element of the crime and also provide reasonable cause to believe that the defendant committed the crime (aside from the law requiring it) is that no grand jury has made such a determination after hearing evidence. (See, Matter of Edward B., 80 NY2d 458, 464-465 [1992].) A defective information cannot be bootstrapped at trial, for example, because a jury (and the defendant) could tell, at the time the alleged victim took the stand, that she was black. Pursuant to CPL 200.50, an indictment need contain only:
“7. A plain and concise factual statement in each count which, without allegations of an evidentiary nature,
*523 “(a) asserts facts supporting every element of the offense charged and the defendant’s . . . commission thereof with sufficient precision to clearly apprise the defendant ... of the conduct which is the subject of the accusation.”
Even with this direction, an indictment charging a hate crime must specifically state that the defendant committed the crime in whole or in substantial part because of a belief or perception that the alleged victim belonged to a protected class such as those with a particular sexual orientation. (Penal Law § 485.05 [1] [a], [b].)
On the other hand, the petition sufficiency provisions of Family Court Act § 311.2 require that the petition must supply factual allegations to establish reasonable cause to believe that the respondent committed the crime and nonhearsay allegations must establish every element of the crime charged and the respondent’s commission thereof. “In this regard ... a stringent test [must be applied] when construing challenges to the facial sufficiency of a juvenile delinquency petition to assure that there is a valid and documented basis for subjecting the juvenile to prosecution.” (Matter of Neftali D., 85 NY2d 631, 636 [1995].)
So, a grand jury, in handing up a hate crime indictment, would have observed, for example, the race of the alleged victim. Or it would have heard other evidence on the issue of whether the alleged victim was in a protected class. It would also have determined whether there was reasonable cause to believe that the defendant was prejudicially motivated. In a juvenile delinquency proceeding in Family Court, the petition or supporting depositions must substitute for that process and contain some evidence on the protected class belief/motivation issue. If this were not the case, the presentment agency could charge a juvenile with a hate crime by alleging nothing more than, for example, that the respondent was white and the alleged victim was black. Because the statute eliminates mistake of fact as a defense, if coupled with an assault, the following could also provide the basis for charging a hate crime: calling a black person a white Aryan bastard; calling a man a bitch; calling a person of Irish decent a kike; calling a Jew a wop. On the other hand, would calling a priest a heathen be a predicate for a hate crime? Or would calling an atheist or agnostic a Christian or Islamic fascist pass muster as a creed-based hate crime? Would calling an elderly woman an “old hag” be a hate crime based both on age and gender? Though it is unlikely any prosecutor *524 would bring such charges, it could be done under the law — but not without some pleading statement as to the belief or motivation of the defendant. The Rivera holding would allow the element of intent to be established by conduct and circumstances established at trial. But this is not what the law requires or due process demands. Accordingly, this court declines to follow Rivera.[3]
Further support for this holding can be found in CJI2d(NY) Penal Law § 240.30 (3). It clearly sets forth as an element of the crime, upon which a trial jury must find evidence beyond a reasonable doubt to convict, that the defendant acted “because of a belief or perception” regarding the protected status of the alleged victim. (CJI2d[NY] Penal Law § 240.30 [3].)
The presentment agency also cites People v Pirozzi (237 AD2d 628 [1997]) and Matter of Rey R. (188 AD2d 473 [1992]) to support its argument. However, both cases are distinguishable. In Pirozzi, a police officer was charged with assaulting a woman he had placed under arrest and during the course of the arrest assaulted her while calling her a “little black bitch” (at 629). The defendant moved to dismiss at the close of the People’s case because of the insufficiency of the evidence on the hate crime issue. The appellate court upheld the trial court’s decision to submit the case to the jury. However, the legal standard at that point in the process is different from that used to review the legal sufficiency of an accusatory instrument, so the holding in Pirozzi does not apply to this case.
In Matter of Rey R., the juvenile was charged with grand larceny and criminal possession of stolen property. The respondent argued that the petition was defective because there was no affidavit of the car owner to establish that the vehicle had, in fact, been stolen. The appellate court held that the supporting deposition of the police officer was sufficient to establish this element of the crime. The officer’s statement said that when he approached the car the respondent was sitting in the driver’s seat, the engine was running, the steering wheel and vent window were broken, the juvenile did not know whose car it *525 was and he had a screwdriver in his possession. The Court held that these factual allegations were sufficient to establish for pleading purposes that the car was stolen.
In the petition now under review, there is nothing alleged from which to infer that the respondent selected the complainant because of his (the respondent’s) belief in the complainant’s sexual orientation other than that he called him a faggot. If this standard for pleadings were upheld, a teenage boy could be charged with a gender hate crime if he called another boy a girl but used a more genitalia referenced adjective commonly heard in locker rooms. In such a case, the presentment agency would necessarily have to argue that the respondent had a belief, though mistaken, that the boy was a girl. The law does not countenance absurd results such as this. In this case, there must be some pleading statement from which one could reasonably infer that this respondent selected his victim, at least in substantial part, because he (the victim) was a homosexual. Because there is no support for such an inference contained in this petition, the petition must be dismissed.

. This is not technically a hate crime as defined in the Penal Law. Penal Law article 485 contains the Hate Crimes Act of 2000. The statute basically sets forth a list of crimes to which it applies and enhances punishment if the crime is committed with a prejudicial motive, as defined. Aggravated harassment as defined in Penal Law § 240.30 (3) is not a listed hate crime. However, that section restates, in part, one of the motive sections of article 485, namely, section 485.05 (1) (a). However, section 485.05 (1) (a) requires that the victim be “intentionally” selected “in whole or in substantial part” because of a belief by the defendant regarding the complainant’s sexual orientation. This law became effective October 8, 2000. Penal Law § 240.30 (3), which was amended at the same time, does not contain the victim selection language. The Hate Crimes Act also provides that proof of the defendant’s or complainant’s sexual orientation is not sufficient to make out a prima facie case. It is not readily apparent if this was meant to convey a different theory of the crime or add a new element that is not contained in section 240.30 (3).

. The urban legend source of the meaning of faggot to refer to a homosexual comes out of this meaning. It is suggested, without any evidence, that heretics were placed on piles of faggots when burned at the stake during the Inquisition and that heretics included homosexuals. Hence, a homosexual became associated with a faggot. This is an explanation that sounds good but is supported by no evidence. Another explanation, which does have an inferential logic to it, is the use of the word fag in English universities to refer to a first-year student who was required to be a gofer for seniors.

. (Brian S. MacNamara, New York’s Hate Crimes Act of 2000: Problematic and Redundant Legislation Aimed at Subjective Motivation, 66 Alb L Rev 519 [2003].) In this article, the author suggests that almost any random violent crime could be charged as a hate crime because of the victim selection process. For example, many robbers select older victims because they are vulnerable (as a young person or woman might also be). Also, all rape victims are selected because they are women. No doubt, the Legislature did not intend the Hate Crimes Act to have such a reach — but it could.